This action was brought by the administratrix of the estate of Martin Raolaslovic to recover damages for his death. Raolaslovic came to his death through drowning in the waters of New York harbor. It is claimed that he was drowned through the negligence of his employer, the defendant, the New York Central Railroad Company, or its agents and servants. After a trial of the issues before a jury a verdict awarding damages to the plaintiff was returned. The judgment entered upon the verdict was reversed by the Appellate Division and the complaint dismissed. From the judgment of reversal and dismissal this appeal was taken.
Martin Raolaslovic was first deckhand upon a steam tug known as New York Central Tug No. 3. The tug was making a trip from Weehawken, New Jersey, down river to pier 38, New York city. The tug was 105 feet long. To its port side there was strapped a barge 100 feet long. The bow of the barge projected forward of the bow of the tug, while the stern of the tug projected aft of the rear of the barge. Fenders eighteen inches in diameter hung from the opposing gunwales of the two boats. The space separating the two vessels was, therefore, at least eighteen inches amid ships, while forward and aft, owing to the sheering sides of the tug, the separation was greater, increasing to four or five feet. The tug steamed across and down river in a strong ebb tide until it came to a point opposite pier 38 and within two hundred feet thereof. At this point Captain Ripley, the captain and skipper of the tug, put his wheel to starboard to swing the tug upstream and against the tide in order to bring the barge alongside the pier on the south. Raolaslovic *Page 94 
was then stationed in the pilot house of the tug. It was a part of his job to handle the hawsers of the barge so that she might be drawn to the pier and made fast. He ran down the stairs to the forward deck; called to an employee, named Nikoletich, that it was time to go to work and passed down the port side of the tug with the intention of crossing over to the barge. Nikoletich saw him as he passed, and soon after heard him scream. Looking up he saw that Raolaslovic had disappeared. He hollered to the captain, "Martin overboard," ran to the port side of the tug, and saw Raolaslovic in the water between the barge and the tug, about two feet from the end of the barge. The witness Rudman ran up from the kitchen and the two busied themselves with lines to throw to Raolaslovic, but the lines were so heavy that they dared not throw them. Nikoletich then saw Raolaslovic from ten to fifteen feet astern of the tug, a little upriver, "swimming strong" against the tide in water that was not rough. He was swimming toward the barge and appeared to be in no kind of trouble. About this time the captain, who had stopped the engine of the tug, rang two bells to reverse, and, according to Nikoletich, backed the tug to the rear. According to the captain's story the tug made no sternway but merely came to a stop. However this may have been, there is no dispute of the fact that the propeller of the tug in reverse kicked up "quick waters" under her stern, or that it set up a strong suction toward the tug of the afterwaters. Nikoletich saw Raolaslovic go down and pass under the stern of the tug. The undisputed proof, therefore, justified an inference that Raolaslovic was drawn under the tug by the suction thus created. Moreover, when the dead body of Raolaslovic was finally recovered, a wound appeared upon his head. The nature of the wound justified an inference that Raolaslovic had been struck upon the head by the blades of the propeller toward which he had been drawn.
Experts testified to the manifest truth that a propeller, *Page 95 
driving a vessel forward, sucks the waters passing aft along the sides of the vessel and throws them astern; that a propeller in reverse sucks waters from astern and drives them forward against the stern of the vessel, creating "quick waters," a high wave, and serious eddies. One expert stated that the suction set up by a reversed propeller extends its influence to the waters fifteen to twenty feet astern, in an arc of 120 degrees, or about one-third of a circle. Within this area a floating body is subjected to a greater or lesser pull from the suction, accordingly as it is nearer to or more remote from the propeller. The experts agreed that it was bad seamanship in the case of a man overboard astern of a vessel, within fifteen feet of the propeller, to reverse engines and move a tug, such as the one in question, to the rear. Therefore, if the evidence here was such as to justify the jury in believing that the tug in question was actually moved astern, then, according to the undisputed proof, a case of bad seamanship and negligence was made out. We would then have Captain Ripley's own judgment upon his own case that he was guilty of bad seamanship. He was asked and answered as follows: "Q. I am asking you whether it is proper or improper to back down on the man? A. It is improper to back down on him, but — Q. Yes, it isn't good seamanship, is it? A. No, sir; nobody would do it."
That nautical men in their speech frequently confound the backing of a vessel with a reversal of its engines, stating that a boat is backed when meaning merely that its engines are reversed, is a fact which must be borne in mind when the proof is examined. Captain Ripley testified that when he first heard Nikoletich cry, "Martin overboard," he swung his wheel to starboard in order to turn the tug's stern to starboard away from Raolaslovic; that the tug was moving about three miles an hour; that he saw Raolaslovic about twelve or fourteen feet from the stern of the tug and to the north; that he gave *Page 96 
one bell to stop; that five seconds later he gave two bells to reverse the engines; that three seconds later he gave one bell to stop; that the tug came to a full stop; that it made no sternway; that he last saw Raolaslovic fifteen feet from the tug's stern up river. However, on cross-examination, he was shown a paper, upon which, in language of his own composition, he had written to the local board of inspectors as follows: "I immediately backed my tug and tow. While doing this, I saw Martin Raolaslovic come to the surface about fifteen feet astern of the barge Canton. He remained there for a fraction of a minute, and then went down and passed under the stern of my tug." It will be observed that Captain Ripley did not say merely that he backed his tug, but that he backed the tug "and tow." He could hardly have meant merely that he reversed the engines of the tug. That he meant that he actually moved the tug and tow to the rear is shown by his answer to a question put by an inspector before whom he was examined. The inspector asked: "Did you see him after he got overboard?" and he answered: "Just for a second, just for a minute, just came up, you know, as I backed down to get him."
The witness Nikoletich gave definite testimony that the tug was moved astern. He was asked: "Well, when you wanted to throw him the line from the barge, did the tug keep going ahead, did it stop or did it go back?" He answered: "It went back." He said of Raolaslovic: "I said he turned himself over. He was going to get away from the barge when they started to back up. He see the barge was coming on top of him, and he was going to get away, to swing himself over." Again he said: "And I see he was trying to get away from the barge when he backed the tug, when he see the barge was coming on him — on top of Martin — then he turned over on the quick side, and I jumped down in the tug in the stern, and George Rudman hollered to the captain: `He is gone, *Page 97 
he is gone.' `Well,' I said: `He is gone.'" Again he said: "Then, when he was backing, when he (Rudman) see that Martin went down, then he was holler to captain again, `stop it, stop it, stop.'" The testimony of the witness presents a clear picture of a man overboard, fifteen feet astern of a tug, with the tug backing down upon him while he is swimming strongly, striving to get away from the tug and its tow, that they might not come on top of him, and of two excited sailors crying out to the captain "stop the tug, stop it, stop it," in a vain effort to prevent the swimmer from going under the stern. The jury was entitled to believe that the picture thus drawn was the true picture of the accident; that the captain actually backed his tug to the rear toward Raolaslovic; that in so doing he was guilty of negligence.
It is said that the captain of the tug, flurried by an emergency, merely made an error of judgment in choosing the course which he pursued, and, therefore, as a matter of law, was not negligent. The answer is that the captain himself repudiated the idea that in a moment of excitement he did the wrong thing. He asserted that he was guilty of no error whatsoever; that it was proper to reverse the engines for a moment; that it would have been highly improper to back the tug to the rear; that "nobody would do it;" and he stoutly maintained that he did not commit that gross error of seamanship. Notwithstanding his testimony, upon the other proof given, the jury was entitled to believe, as we have said, that he did back the tug down upon or toward Raolaslovic. In this view of the case, the doctrine that one acting in an emergency is not to blame for an error of judgment could have no application. The captain would stand self-condemned, guilty of unseamanlike conduct, of an act which "nobody would do," and, therefore, of actionable negligence.
The respondent also asserts that the captain of the tug was engaged in making a rescue and should not be *Page 98 
held liable for a mistake made in an effort to perform a benevolent act. The respondent loses sight of the fact that the captain was not charged with a mere omission to save life by means adequate to that end. He was charged, not with a failure to remove the peril in which Raolaslovic found himself, but with a positive act creating the very peril which caused the man to drown. Raolaslovic was "swimming strong;" he was within two hundred feet from shore; he appeared to be in no difficulty. In this situation the captain backed the tug and barge toward him, thereby bringing nearer to him the perilous suction of the tug's propeller, if not actually engulfing him in the waves set up under the stern of the tug. Here is no well-intentioned rescuer failing to save. Rather have we a seasoned mariner, an experienced sea captain, backing down his vessel upon a man overboard, a thing "nobody would do," not saving, but actually drowning a strong swimmer not far from shore.
Several experts testified that, regardless of whether the tug itself was backed, a reversal of its propeller, with a man overboard within fifteen feet of the tug's stern, constituted bad seamanship. Thus the witness, Captain Milliken, said: "It is well known amongst seafarers generally that if a man is astern of a vessel, if the wheel is moved he would be drawn toward or under the vessel, and I would consider it very poor seamanship in any event to reverse the engines of any ship, unless there was something ahead that you might run into, if a man fell overboard." Obviously, a suction is set up toward a vessel's stern by a reversed propeller, regardless of whether the vessel moves back or still goes forward. The suction in the former instance creates a greater pull than in the latter, upon a man overboard, merely because the propeller is brought nearer. If, however, the man is sufficiently near he will be drawn under whether the boat itself is backed or otherwise. Captain Ripley was at all times conscious of the danger to Raolaslovic from the *Page 99 
propeller. He was asked, "You knew that a man overboard, if you come near him with your stern and your propeller is turning, that the suction created by the turning of the propeller would suck the person in the water under the stern; is that right?" and he answered: "Yes, sir; it would have a tendency to do it." The captain first saw Raolaslovic in the water about twelve feet from the stern of the tug. Instead of stopping the engine of the boat and ending the suction, which he knew to be dangerous, he reversed the engines, an act which, under the testimony, inevitably set up a pull upon the waters within fifteen feet of the vessel's stern, or upon the very waters in which Raolaslovic was swimming. Captain Ripley said: "As soon as he showed up I reversed, and stopped the way of my boat." He said that he did this in order that the tug might not continue to move away from the man overboard. Yet the tug was moving forward at no more than three miles an hour. With the engines stopped, the tug, with its deep draft of fourteen feet, would soon have been brought to a standstill. Meanwhile, Raolaslovic, who was swimming strongly, could doubtless have kept near the slowly drifting tug. However, if it be true that Captain Ripley reversed his engines without reversing the motion of the boat, then there may have been presented the case of an emergency in which he was guilty of a mere error of judgment. He may have chosen wrongly. The event may have proven that he should have stopped his engines rather than have reversed them. That would not necessarily have established negligence. Nevertheless, it would still have been a question of fact for a jury to decide, whether Captain Ripley was negligent or merely committed an error of judgment in an emergency.
In support of the dismissal the respondent cites Wynn v.Central Park, N. E. River R.R. Co. (133 N.Y. 575); Bittner
v. Crosstown Street Railway Co. (153 N.Y. 76); Stabenau v.Atlantic Avenue R.R. Co. (155 N.Y. 511 *Page 100 
), and Lewis v. Long Island R.R. Co. (162 N.Y. 52). In none of these cases was it held or stated that a dismissal should have been granted for the reason that an error of judgment rather than a fault of omission or commission was the cause of the damage complained of. In all of them reversals were granted and new trials ordered. A failure, on the part of the trial judge, to give proper and sufficient instructions to the jury in respect to non-liability for a mere error of judgment was the common cause of the reversals. In the Lewis case it was said: "Still, when an emergency presents itself, and a person is under great excitement from the presence of an impending peril, he may not act with that perfect judgment that he would under other and different circumstances and still not be negligent. * * * Where an employee of a railroad company is confronted with a sudden emergency the failure on his part to exercise the best judgment the case renders possible does not establish lack of care and skill upon his part, which renders the company liable." There might be cases of so clear a character that it would be possible to say as a matter of law that a mere error of judgment in an emergency was committed rather than a negligent fault. Ordinarily, however, the question presented, as in all negligence cases, is one of fact for a jury. The standard of the man of ordinary prudence and skill must be applied. Of that standard and its application the twelve men of the jury are ordinarily the most competent judges. In our case was there an emergency? Was Captain Ripley "under great excitement from the presence of an impending peril?" Did he fail to act with "that perfect judgment" he would have employed under different circumstances? These were questions of fact necessary to be decided by a jury before the doctrine of "mere error of judgment" could be applied. There was room for them to believe that Captain Ripley was not excited; that there was no emergency; that what he decided to do is what he would *Page 101 
have decided upon after mature reflection. Was it bad seamanship for Captain Ripley to reverse the engines? It was not enough that he should "act prudently, in view of the knowledge which he actually had. He is responsible for his ignorance of that which he ought to have known." (Shearman Redfield [5th ed.], § 87.) If, among seafaring men it is universally regarded as bad seamanship to back a vessel's engines, when there is a man overboard astern, though he may not have known it, Captain Ripley, unless guilty of a mere error in decision, committed an unseamanlike and negligent act. Nor would the fact that his fault involved an error of judgment necessarily absolve him from blame. "Error of judgment there may have been, but error is not inconsistent with fault. The standard of diligence exacted is that of the typical prudent man. The individual must answer for the consequences when he falls below that norm." (Per CARDOZO, J., in Pellegrino v. Smith Company, 226 N.Y. 165.) In short, even if it be true that Captain Ripley merely reversed his engines without making sternway, it was a question for the jury whether, applying the standard of the ordinarily prudent and skillful seaman, he was guilty merely of an erroneous judgment, rendered hastily in an emergency, or, on the other hand, committed an act of negligence. We think that in either aspect of the case the evidence presented a question of fact for the jury.
The Appellate Division reversed the judgment on the law and facts and granted a dismissal. We cannot, therefore, reinstate the verdict, but must order a new trial. (Maguire v. Barrett,223 N.Y. 49.)
The judgment of the Appellate Division in so far as it dismisses the complaint should be reversed and a new trial granted, with costs to abide the event.
CARDOZO, Ch. J., POUND, CRANE, ANDREWS, LEHMAN and O'BRIEN, JJ., concur.
Judgment reversed, etc. *Page 102