Hillsborough, }
June 7, 1927. }

ELGIN A. JONES, *Adm'r* OF HARRY W. CHEEVER,
*v.* BOSTON & MAINE RAILROAD.

ELGIN A. JONES, *Adm'r* OF MARY I. CHEEVER, *v.* SAME.

74

*Kittredge & Prescott, Doyle & Doyle* and *Philip H. Faulkner* (*Mr. Paul J. Doyle* orally), for the plaintiff.

*Warren, Howe & Wilson* and *Demond, Woodworth, Sulloway & Rogers* (*Mr. Howe* orally), for the defendant.

BRANCH, J. The plaintiff's claims of negligence may be summarized as follows: (1) failure to provide an automatic signal at the crossing; (2) excessive speed of the train; (3) the conduct of the engineer, (a) in failing to give a warning signal after he saw the truck, (b) in failing to use sand when the emergency brake was applied.

In plaintiff's brief a further suggestion is made that it might be found that the brakes were not applied at all until after the collision took place. The only evidence referred to as tending to sustain this claim is that of a passenger in one of the cars who testified that he was leaning on his arms on the seat in front, that the first notice he had of the accident was a "thump" which threw him against the back of the seat, and that before this, he had not "felt any shock from the brakes at all." Upon cross-examination, he testified that he was

not paying attention to the running of the train, that at no time before the train stopped did he feel any application of the brakes and that he did not know how they stopped the train. In view of the direct testimony of the defendant's witnesses that the brakes were given an emergency application, it is doubtful whether the "thump" referred to by the witness was caused by the collision or by the brakes, but if it be assumed that what he felt was the jar of the collision, his testimony, clearly explainable on the ground of inattention, "amounts to no more than a *scintilla* which reasonable men could not consider sufficient to counterbalance the direct evidence of the fact." *Collins* v. *Hustis*, 79 N. H. 446, 447; *Morier* v. *Hines*, 81 N. H. 48, 53; *Kingsbury* v. *Railroad*, 79 N. H. 203, 204; *Gage* v. *Railroad*, 77 N. H. 289, 295.

In answer to plaintiff's first two claims of negligence, the defendant argues that the only duty of the railroad was to make its crossing safe for use by travelers who exercised due care for their own safety, and that under the circumstances disclosed by the evidence, it could not be found that "the crossing as it was and the train as it was managed" constituted "an unreasonable danger to a careful highway traveller." A thorough examination of the record leads to the conclusion that, when tested by the standard thus set up, there was sufficient evidence of defendant's fault to go to the jury.

In determining whether a traveler, in the exercise of ordinary care, might fail to discover the approach of a train, it is obvious that the question whether the view of the track from the highway is open or obstructed, is of prime importance. It has so been treated in many cases. *Phillips* v. *Railroad*, 81 N. H. 483; *Hurlich* v. *Railroad*, 81 N. H. 286; *Romani* v. *Railroad*, 81 N. H. 206; *Morier* v. *Hines*, 81 N. H. 48; *Speares Sons Co.* v. *Railroad*, 80 N. H. 243; *Quimby* v. *Railroad*, 79 N. H. 529; *McGinley* v. *Railroad*, 79 N. H. 159; *Fuller* v. *Railroad*, 78 N. H. 366; *Wiggin* v. *Railroad*, 75 N. H. 600; *Stone* v. *Railroad*, 72 N. H. 206. Where the physical surroundings are such that a traveler might be unable, by the use of ordinary care, to discover the approach of trains, the question of the adequacy of the protection furnished by the railroad becomes one of fact for the jury. *Hurlich* v. *Railroad; Romani* v. *Railroad; Speares Sons Co.* v. *Railroad, supra.*

In the present case, the view of the track from the highway available to a traveler approaching from the west, is greatly obstructed by a set of farm buildings and a station building located between the railroad and the highway. The farm buildings consist of a house,

garage, barn, shed and hen house, extending from a point six hundred feet from the crossing on the highway to the three hundred fifty foot point. The station building begins opposite the one hundred eighty foot point and extends to the one hundred twenty foot point, and at the latter point the view of the track by the west end of the station is completely cut off by the combined effect of the station building and the shed above mentioned. As the station building is passed, a view of the track looking by the east end of the station begins to develop, and becomes gradually more extensive so that at seventy feet from the crossing a traveler could see two hundred sixty-five feet of track; at sixty feet, three hundred twenty-seven feet of track; at fifty feet, four hundred twenty-five feet of track; at forty feet, eight hundred feet of track; at thirty-five feet, fifteen hundred feet of track; at thirty feet, two thousand feet of track.

Both parties agree that the first useful view of the track in this direction could be obtained at the sixty foot point. In order to obtain these views, it would be necessary for a highway traveler to turn his head increasingly to the left and look more and more behind him on account of the acute angle at which the road and the track intersect, and he would, therefore, be unable to observe both the railroad and the highway at the same time. This fact might properly be regarded by the jury as a most important element in the situation. *Fuller* v. *Railroad*, 78 N. H. 366. In short, the danger of crossing the railroad at this point was increased first, because the possibility of obtaining antecedent views of an approaching train was greatly reduced by the presence of the buildings above mentioned, and second, because it was impossible for a driver to keep both the track and the road in sight at the same time after reaching the point where a useful view of the railroad by the east end of the station became available. If, for the convenience of the public, the defendant deemed it necessary to run trains over a crossing where the view was thus obstructed, at a speed of forty to fifty miles per hour, it was for the jury to say whether ordinary prudence would not require more effective warning of the approach of trains than was furnished by the whistle and bell of the locomotive. *Collins* v. *Hustis*, 79 N. H. 446, 449; *Hicks* v. *Railroad*, 164 Mass. 424.

Since Mary I. Cheever was a passenger in the truck, the negligence of the driver, if any, could not be imputed to her, and since there was no evidence of fault on her part, it follows that defendant's exceptions in the second case must be overruled. *Williams* v. *Railroad*, 82 N. H. 253, 254.

Plaintiff's counsel have treated the first case as though it stood upon the same ground, but the evidence does not justify this assumption. Moore, the driver of the truck, was the servant of the deceased, Harry W. Cheever, and if his conduct was such as to bar a recovery in his own behalf, there can be no recovery by the estate of his employer. The principle of *respondeat superior*, although usually invoked in cases where the master is a defendant, applies with equal force to those in which he is a plaintiff. This was the situation in *Jones* v. *Railroad*, 78 N. H. 551, and the principle was there applied without objection. The citation of authorities for such an obvious conclusion seems superfluous, but reference may be had to Berry, Automobiles (5th *ed.*), *s.* 573, where the above rule is stated. The contention of the defendant that the evidence conclusively demonstrated the negligence of the truck driver must therefore be considered.

The question of due care on the part of decedents in cases of fatal accidents upon grade crossings and at similar places, has received frequent and exhaustive consideration by this court in no less than twenty-two reported cases. *State* v. *Railroad*, 52 N. H. 528; *Huntress* v. *Railroad*, 66 N. H. 185; *Evans* v. *Railroad*, 66 N. H. 194; *Lyman* v. *Railroad*, 66 N. H. 200; *Davis* v. *Railroad*, 68 N. H. 247; *Folsom* v. *Railroad*, 68 N. H. 454; *Smith* v. *Railroad*, 70 N. H. 53; *Stone* v. *Railroad*, 72 N. H. 206; *Tucker* v. *Railroad*, 73 N. II. 132; *Minot* v. *Railroad*, 73 N. H. 317; *Brown* v. *Railroad*, 73 N. H. 568; *Wright* v. *Railroad*, 74 N. H. 128; *Stearns* v. *Railroad*, 75 N. H. 40; *Gibson* v. *Railroad*, 75 N. H. 342; *Wiggin* v. *Railroad*, 75 N. H. 600; *Cavanaugh* v. *Railroad*, 76 N. H. 68; *Jones* v. *Railroad*, 77 N. H. 220; *Hayes* v. *Railroad*, 78 N. H. 581; *Collins* v. *Hustis*, 79 N. H. 446; *Haywood* v. *Railroad*, 79 N. H. 520; *Hurlich* v. *Railroad*, 81 N. H. 286; *Phillips* v. *Railroad*, 81 N. H. 483.

Only four cases have been found in which a recovery was denied as a matter of law because of the contributory negligence of the decedent, viz: *Wright* v. *Railroad; Gibson* v. *Railroad; Hayes* v. *Railroad; Collins* v. *Hustis, supra.*

All of the cases above referred to, down to and including *Jones* v. *Railroad*, 77 N. H. 220, were decided before the passage of Laws 1915, *c.* 148, which imposes upon the defendant the burden of proving contributory negligence in cases of personal injury. But even under the rule formerly prevailing, which cast upon the plaintiff the burden of disproving contributory negligence, it was well settled "that direct affirmative proof may be dispensed with, when upon the competent evidence reasonable men exercising their judgment upon the subject

could say, from the manner in which the injuries were inflicted, that it is more probable than otherwise that the deceased was in the exercise of due care, or that no amount of care on his part would have prevented his injury." *Wright* v. *Railroad*, 74 N. H. 128, 132.

The statutory shifting of the burden of proof above referred to, greatly improved the position of plaintiffs in cases of this character. Under the present law no evidence as to the care of the deceased is necessary as a part of a plaintiff's case, and when his conduct is disclosed by the evidence a verdict can be directed for the defendant only when it conclusively appears that he was at fault, as in *Collins* v. *Hustis, supra*. If his conduct admits of any reasonable and nonculpable explanation, the question of his due care is for the jury. *Hussey* v. *Railroad*, 82 N. H. 236, 240. Whatever doubts may have been felt as to the soundness of the reasoning in some of the older cases which were governed by the common-law rule, there can be little doubt but that an application of the new rule to the evidence reported in these cases would require the submission of the question of the decedent's care to the jury in almost every instance.

In the present case the only direct evidence as to what Moore, the driver, did was to the effect that he slowed down as he approached the track and drove onto the crossing without changing his course, at a speed of eight or ten miles per hour. From the position of the gear shift lever after the accident, it might be inferred that he shifted into second speed before going upon the track. No witness testified as to whether he looked or listened, but from the testimony that, upon other occasions, he was "very careful at crossings" it might be found that he did both. *Evans* v. *Railroad, supra; Lyman* v. *Railroad, supra; Smith* v. *Railroad, supra; Stone* v. *Railroad, supra; Tucker* v. *Railroad, supra*. If it be assumed that he looked and listened, however, it cannot be determined definitely what he saw or heard, or what he ought to have seen or heard.

There was evidence that, at the time of the accident, it was raining hard, and that the rain on the roof of the truck made a "considerable" noise. The witness stated that "the truck itself did not make as much noise as the rain on the roof of the truck." From this evidence it was a permissible inference that the noise of the rain may have prevented the driver from hearing the whistle and other noises of the train.

In considering the question of what he saw or ought to have seen, a comparison of the facts in this case with those disclosed in *Collins* v. *Hustis, supra*, will be useful, since this is the only case decided

under the statute of 1915, in which a verdict for the defendant has been directed upon the ground of the decedent's contributory negligence. In that case the decision was based upon the ground that it conclusively appeared that the train approaching from the left, must have been visible to the driver of the automobile in season for him to have stopped his machine, and the court held that from the evidence, only three conclusions could be drawn in regard to his conduct, viz: (1) that he took no precautions to learn if the train was approaching and drove onto the crossing in ignorance of its proximity; or (2) that he failed to diminish his speed when near the crossing so that it was impossible to stop upon observing the train; or (3) that knowing the train was approaching, he voluntarily and unnecessarily took the risk of an attempt to pass in advance of it. Upon any view of his conduct, it was held that the evidence conclusively established his fault.

In the present case also, it may be said that it conclusively appears that the train approaching from the left must have been visible to the driver in season for him to have stopped his machine, but in terms of time and distance this only means that he might have seen the train and stopped if he had turned his head and looked over his left shoulder during the time he was traversing a distance of forty feet, which at a speed of eight to ten miles per hour would require from $2\frac{2}{3}$ to $3\frac{1}{3}$ seconds. This is a necessary conclusion because both parties are in substantial agreement that the view of the track from the highway, looking by the east end of the station, first becomes valuable as a means of discovering the approach of the train, at a point sixty feet from the crossing, and it required twenty feet to bring the truck to a stop. Moreover, the evidence in the present case does not necessarily lead to any one of the three fatal conclusions in regard to his care which could not be escaped in the *Collins* case. There is in this case no basis for a finding that Moore failed to diminish the speed of his truck so that it was impossible for him to stop upon observing the train. In fact, the only evidence in the case was to the effect that he did slow down and approach the crossing slowly. Neither is there any basis in the evidence for a finding that, knowing of the approach of the train, he undertook to precede it across the intersection. All accounts of the accident agree that he drove slowly onto the track without changing his course, and the only reasonable conclusion to be drawn from the testimony was that he was ignorant of the presence of the train. It does not necessarily follow, however, that he took no precautions to learn if the train was approaching, or

that his ignorance was culpable. On the contrary, as pointed out above, it might be found from the evidence of his habitual care upon other occasions that he looked at a proper time, and from other evidence in the case it might be found that he was unable to see the train because the view was obstructed by the station building or dimmed by falling rain.

There is no suggestion in the evidence that Moore had accurate knowledge of the fact that his first useful view of the track would be obtained at the sixty foot point. Sixty feet may be regarded as a very short distance by the driver of an automobile approaching a railroad crossing, and he might naturally be expected to look before reaching that point. If, in the present case, Moore had looked at the sixty-five foot point, he would have been able to see two hundred seventy-five feet of track, but the train, if it was approaching at a speed of fifty miles per hour, would not have been in sight. It cannot be said, as a matter of law, that if he had heard no warning signals or noises from the train, he would not then have been justified in assuming that no train was coming and in giving his attention to the operation of his truck for the next three seconds, or glancing to the right, from which side a train was equally apt to be approaching. His shift into second speed may have taken place at this time. If he had looked at sixty feet from the crossing the train would have been barely in sight, and his vision might have been dimmed by falling rain. In order to take in the view of the entire length of track which was visible at this point he would have had to turn his head sharply to the left and look back over his shoulder. Whether, if he looked under these circumstances, he ought to have seen far enough up the track to catch a glimpse of the train was a question of fact. *Fuller* v. *Railroad, supra.* "The practical proposition was whether he looked up the track as the average person would look for an approaching train, and so looking saw nothing." *Romani* v. *Railroad*, 81 N. H. 206, 208. Although a jury might think that a driver at the crossing in question, knowing that the view to the left was obstructed, ought, in the exercise of due care, to have looked continuously in that direction, this court cannot draw such a conclusion from the evidence, as a matter of law. *Stearns* v. *Railroad*, 75 N. H. 40, 45. The argument that if the deceased had looked toward the train when he had the opportunity, he must inevitably have seen it, and that he was negligent if he failed to look, or looking failed to see, has been unsuccessfully urged in many cases. *Lyman* v. *Railroad; Smith* v. *Railroad; Stone* v. *Railroad; Tucker* v. *Railroad; Minot* v. *Railroad; Stearns* v. *Rail-*

*road, supra.* It cannot be adopted in the present case. The question of the truck driver's negligence was, therefore, for the jury.

Even if it should be found that the truck driver was at fault, it would not necessarily follow that the plaintiff, in the first case, must fail, for by his claim that the engineer failed to do what reasonable care demanded after he discovered the presence of the truck in the highway, the plaintiff invokes the "last chance" doctrine.

The defendant argues that since a locomotive engineer, seeing a highway traveler approaching a railroad crossing, "is justified in assuming that he will exercise common prudence and stop before reaching the place of danger" (*Waldron* v. *Railroad,* 71 N. H. 362, 365), and since the truck might have been stopped in twenty feet, the engineer could not be found negligent in failing to act before the truck reached a point twenty feet from the crossing. The answer to this argument is, that when the engineer saw the truck fifty or sixty feet from the crossing, he did not assume that the driver was going to stop before reaching the place of danger, if in fact he might have done so, but on the contrary, he appears to have sensed the probability of a collision and realized his obligation to prevent it if possible. His conduct must, therefore, be judged by the standard applicable to one who, having knowledge of the existence of a danger, is charged with a duty to meet it by "protective action." *Kenney* v. *Len,* 81 N. H. 427, 429. He testified that upon discovering the presence of the truck fifty or sixty feet from the crossing, he shut off the steam and gave the brakes an emergency application. This conduct is explainable only upon the ground that he observed something about the operation of the truck which led him to foresee the likelihood of a collision. His efforts to stop the train are inconsistent with an expectation on his part that the truck driver would stop and thus avoid an accident. He must be charged with knowledge that the driver did not know or did not appreciate the danger. Being thus in possession of superior knowledge of the situation, he had the last chance to avoid the accident according to the rule as it has been developed in this state. *Bursiel* v. *Railroad,* 82 N. H. 363, 370; *Olsen* v. *Railroad,* 82 N. H. 120, 124; *Lee* v. *Hustis,* 79 N. H. 434, 435; *Olson* v. *Fox,* 79 N. H. 332, 334; *Cavanaugh* v. *Railroad,* 76 N. H. 68, 72. Having realized his duty to act and attempted to perform it, the question whether his conduct was reasonable was for the jury.

When pressed for reasons why he did not apply sand to the rail and blow the whistle, the engineer said, generally, that he did not have time, more specifically, that he did not have much time left

after applying the brakes, and further, that it would not have done any good if he had done either. When asked, "Why didn't you do it and take the chance of seeing whether it would do any good?" he replied, "I don't know why I didn't." There were a number of things which he might have done to reduce the chance of collision. It is doubtful whether he had time to do them all. He elected to shut off the steam and apply the brakes. Whether, under the circumstances, he thus measured up to the standard of due care, was a jury question. The fact that his train could not be stopped in less than seven hundred feet, and that he was already within one hundred fifty feet of the crossing, made it impossible for him to stop in time to avoid a collision. The truck was then fifty or sixty feet from the crossing and might have been stopped in twenty feet. The only real chance of avoiding an accident, therefore, lay with the truck driver. Under these circumstances, the jury would be justified in finding that a blast on the whistle to spur him to action was the most promising kind of "protective action" which the engineer could have chosen, and that he was at fault for devoting his time to futile efforts to stop the train. That an engineer may be found negligent for failing to sound a warning whistle after discovering a traveler in a dangerous situation, is well settled by the decisions in this state. *Tyrrell* v. *Railroad*, 77 N. H. 320; *Cavanaugh* v. *Railroad*, 76 N. H. 68; *Stone* v. *Railroad*, 72 N. H. 206.

The defendant strenuously insists that there is no basis in the evidence for a finding that the engineer could have prevented the accident by whistling after he saw the truck on the highway. One argument appears in the following quotation from its brief: "The long station whistle, beginning about 600 feet from the crossing and probably continuing five or more seconds, had brought the locomotive within about 300 feet of the crossing — and *done no good;* why then think a whistle, 150 or less feet nearer the crossing, would have *done more?*" This argument obviously rests upon the assumption that the blowing of the so-called "station whistle" was conclusively proved. The evidence does not justify this assumption. The engineer and three other witnesses testified that after the crossing whistle was given, another long blast was blown. The fireman said that in his "best judgment" this was so. The baggageman testified that such a long blast was always "supposed" to be given "before each station crossing," but did not testify specifically regarding the time in question. Six witnesses who heard the crossing whistle, including a train man, did not hear any other whistle. One other witness heard only

one long blast, and another heard only "an ordinary loud whistle." Considerable doubt as to the existence of a general custom to give a station whistle at this point was raised by the testimony of three witnesses. One of them testified that he first noticed the long whistle the morning after the accident, and the other two testified that the long whistles were only given when there was something near the crossing. In this state of the evidence it cannot be held as a matter of law that the giving of the station whistle was conclusively proved. *Williams* v. *Railroad*, 82 N. H. 253, 257.

The crossing whistle was blown at the whistling post thirteen hundred and twenty feet from the point of accident. According to the testimony of the eye witness, Hayward, the truck was then less than four hundred and twenty-five feet from the crossing on the highway which, according to the plan, would place it more than one thousand feet from the whistling post. The truck driver's failure to hear the crossing whistle at this distance may be accounted for by the following facts: (1) he was driving a truck which "was making a lot of noise," (2) it was raining hard, and the rain made "considerable" noise on the roof of the truck. "The truck, itself, didn't make as much noise as the rain on the roof of the truck." (3) he was riding in a "closed-in" cab, the windows of which could be shut in stormy weather, (4) he was clearly inattentive to his surroundings. Because he did not hear the crossing whistle under these circumstances, it does not follow that he would not have heard and paid attention to another whistle if it had been sounded when the engineer first saw the truck. According to the engineer's testimony, he saw the truck when it was fifty or sixty feet from the track and the train was one hundred and fifty feet from the crossing. In this situation the distance of the truck from the locomotive would be less than one hundred and twelve feet, and a conclusion that a whistle at this distance would have been heard and heeded by the driver would be permissible.

Another argument advanced by the defendant is that, if the engineer had blown the whistle when he first discovered the truck in the highway, it could not be found that it would have averted the accident, because there was not sufficient time for the engineer to act, for the sound to reach the truck driver and for him to apply his brakes in season to stop the truck before it reached the track. Basing his calculations upon assumptions which have no foundation in the evidence, counsel figures that 1½ seconds must have elapsed after the discovery of the truck before the sound of the whistle, if it had been blown, could have registered upon the mind of the truck

driver. If these figures be accepted as accurate, it does not necessarily follow that a whistle would have been useless. From the testimony of the engineer, it might be found that the truck was 60 feet from the crossing when he first discovered it and the evidence would justify a finding that its speed at that time was eight miles per hour. It might, therefore, be found that a period of $3\frac{1}{3}$ seconds elapsed before the truck reached a point 20 feet from the track, at which point the possibility of stopping it in safety terminated. Deducting from the available $3\frac{1}{3}$ seconds the $1\frac{1}{2}$ seconds computed by the defendant's counsel, there would be left $1\frac{5}{6}$ seconds for the driver to apply the brakes. It cannot be said as a matter of law that this was not a sufficient time in which to act. There is no basis in the evidence for a finding that the truck driver was incapable of using care for his own protection if apprised of the danger. He directed the course of his truck along the highway without apparent difficulty. He evidently knew that he was at a crossing. It might be found that he slowed down and shifted into second speed before going upon the track. He knew he had others in his care. He was an experienced driver and hence, presumably trained to act promptly and intelligently when confronted by a sudden peril. There was no evidence of any trouble with his hearing. In view of all these facts a jury would be justified in finding that a warning whistle, through an awakened sense of danger in the driver, would probably have prevented a collision. *Tyrrell* v. *Railroad, supra; Stone* v. *Railroad, supra.*

Defendant further argues that the conduct of the engineer should not be judged in this case by the test of reasonable care, after he realized the peril of the truck, but by inquiring "whether he used such judgment, ability and facilities as he had." This contention obviously has reference to the rule of law governing conduct in an emergency and the argument is that if in an emergency he used his best judgment, then as a matter of law, he was free from negligence. Two answers may be made to this line of reasoning. First, the rule of reasonable conduct in an emergency has never been given the interpretation for which the defendant contends. An emergency, plus the exercise of the actor's best judgment does not, as a matter of law, equal due care. The existence of an emergency is merely one of the factors in the light of which the conduct of the actor must be judged. The standard of conduct does not vary in such cases. It must be reasonable. *Carney* v. *Railway*, 72 N. H. 364, 371, 372. *Sevigny* v. *Company*, 81 N. H. 311, 313. Second, the engineer in the present case was not confronted by an emergency, within the meaning of the rule.

The situation which developed here was not an unforeseen or unexpected one. The presence of highway travelers at or near railroad crossings is always to be expected and is one of the things for which an engineer is, or should be, constantly on the look out. When his vigilance results in the discovery of such a situation, it is true that he is called upon to act quickly, but with reference to a foreseen and not unusual peril. The benumbing effect of surprise and terror which may accompany the sudden appearance of a wholly unexpected danger should not, therefore, be present in his case. He should act with the care of a man trained to meet just such situations, not with the terror stricken precipitancy of one who is suddenly confronted with an unforeseen peril. Therefore, the contention that the engineer's conduct in first applying the brake can be justified as a matter of law upon the ground of instinctive action in an emergency, cannot be sustained.

If the evidence in regard to the use of sand would have justified a finding that the engineer was at fault in failing to sand the track, it could not be found that the accident was caused by this failure. The only theory upon which it could be argued that the use of sand would have prevented the accident, is that the speed of the train might thus have been slackened enough to allow the truck to pass ahead of it. The only evidence, however, in regard to the effect of sand was the following rule of the defendant: "the use of sand increases the stopping power of brakes considerably and should always be used in cases of emergency," and the testimony of the engineer that sand increases braking power. The case is bare of evidence as to the extent of such increase. The question how much quicker a train going forty to fifty miles per hour could be stopped with sand than without it, was not touched upon in the evidence. To allow a jury to find upon the present evidence that the application of sand would have prevented the accident, would be to sanction a pure speculation. *Stearns* v. *Railroad*, 75 N. H. 40, 49.

In both cases the order must be

*Exceptions overruled.*

ALLEN and MARBLE, JJ., dissented as to the sufficiency of the evidence on the issue of the last chance doctrine. The others concurred.