ROBERTO BANCHS, a minor represented by his father with patria potestas, MÁXIMO BANCHS, ETC., ET AL., Plaintiffs and Appellants, *v.* JOSÉ HUMBERTO COLÓN ET AL., Defendants and Appellees.

No. R-62-306.      Decided November 29, 1963.

*Carlos E. Colón* for appellants. *Rivera Zayas, Rivera Cestero & Rúa,* and *Jorge V. Toledo* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

We issued a writ of review to examine the application made by the trial court of the sudden emergency doctrine,

also known as imminent peril, to the particular facts of this case.

The facts are as follows: An adult male, 54 years of age, a truck driver, while operating a large truck along a public highway of Puerto Rico was frightened when he saw a wasp fly into the cab of the truck and applied the brakes suddenly, and as a result of the violent braking a youngster who was riding a bicycle behind the truck, whom the truck had passed 10 seconds before, ran into the vehicle suffering considerable wounds on his face and fell unconscious to the pavement. The truck in question is one of those consisting of a motor vehicle with cab which serves as a hauler and a wagon or trailer carrying the load. The truck had air brakes.

As a result of the accident plaintiff minor was unconscious for about six hours. He was confined to the hospital eight days and about two more weeks in his house. The trial judge describes the injuries, as he saw them after they had healed, as follows: "He received a wound about 1-1/2 inches long on the right eyebrow which is practically imperceptible, a V-shaped scar on the right cheek visible at close range but not at a distance, and a wound one inch long which has left a scar on the right chin and a scar of the same size inside the mouth."

We must now pass to consider a part of the facts which is critical, since it is the part which will decide whether defendant is not civilly liable on the basis of the sudden emergency doctrine (to which we shall make reference hereinafter), or, on the contrary, whether such doctrine is not applicable to the case and defendant is liable. In other words, we must determine whether this part of the facts presents an emergency of such a degree—taking into consideration all the aforesaid circumstances of this case—as to justify and exempt from punishment the sudden and dangerous braking. Since this part of the evidence is crucial, it was

so understood by the attorneys for the litigants and the dialogue is interesting. For that reason there is some element of contradiction in the testimony of the truck driver, but it is not important enough to prevent us from understanding what happened. As is usually the case, a painstaking submission to the facts also gives us the key in this case.

From an examination of the transcript of evidence we reach the conclusion that the driver stopped suddenly when he first saw the wasp inside the cab, while it was very near to or standing on the windshield and about 2 or 2-1/2 feet from his face (Tr. Ev. 20). See, in this connection, pp. 18 to 22 inclusive of the record which we copy below, note 1. In the footnote and in the text of the opinion we have italicized the parts which in our opinion are significant and lead us to the conclusion we have reached.

The contradiction referred to above occurs when the driver, led by the hand of his attorney, answers as follows:

—"As soon as the wasp flew into the cab, what did the wasp do?

—It flew through the hole of the windshield.

—And what did it start to do?

—It started to fly over my face as if resting upon me.

—*Did it start to fly over your face?*

—Yes.

—*And you started to move so it would not sting you?*

—Yes, sir." Tr. Ev. 29–30.

That testimony vanishes with the answers of the driver on cross-examination which we copy below.[1]

---

[1] —"Witness, could you explain to the court the reason why you stopped like that?

—As I was telling you before, there were some trees there and there were wasps and I was on the lookout, and all of a sudden a wasp came out of the windshield.

—Of the windshield?

—Of the compartment.

—*In what part of the compartment did you see it?*

—*In front of the windshield.*

Further on plaintiffs' attorney insisted on determining again the exact moment the driver applied the brakes, and he explained that he insisted on it because it was essential. To which the presiding judge answered: "That is in the record. When he first saw the wasp coming out of the windshield he applied the brakes. It is in the record." Tr. Ev. 36.

—What do you call the windshield?
—The glass.
—In front of you or by the side?
—*In front flying on the glass of the windshield, it came out of a narrow crack which was there.*
—Mr. Colón: That wasp flew out of the crack. I ask you now. You applied the brakes suddenly, immediately after you saw the wasp flying on the windshield or after?
—*When the wasp came out I applied the brakes trying to protect myself.*
—Immediately after you saw the wasp you applied the brakes, immediately, and then you protected yourself against it?
—*Yes, sir,* I protected myself and the wasp disappeared.
—But you had already applied the brakes when the wasp disappeared?
—Yes, sir.
—Did the wasp sting you at any moment?
—No, sir.
—*Did it sting you or rest upon your face or upon the hand?*
—*No, sir.*
—Mr. Colón: Why?
—Because it was in front of me.
—Just because the wasp was flying in front of you, did it try to alight upon you? I ask you why do you conclude, tell us some fact why you conclude that the wasp tried to alight upon your body?
—Because it continued to bother me.
—You just said that immediately after you saw it you applied the brakes.
—But . . .
—Was the wasp in front of your face or standing on the windshield?
—*Stuck to the windshield.*
—The distance between your face and the windshield, how far was it?
—This much.
—For the purposes of the record, how far do you say?
—About 2 or 2½ feet.
—Mr. Colón: *From 2 to 2½ feet?*
—*Yes, sir.*
—*And that was where the wasp was flying?*
—*In front of the windshield.*
—Witness, I want to make clear, you have said that the wasp came

476

██ The sudden emergency doctrine announces that the fact that a person is confronted with a sudden emergency not caused by his own tortious conduct which requires rapid decision is a factor in determining the reasonable character of his choice of action. Restatement, Torts, Vol. II, § 296; *Trinity Universal Ins. Co.* v. *Farmers Coop. Exchange,* 233 P.2d 468 (1951); *Ellmore* v. *Des Moines City R. Co.,* 224 N.W. 28 (1929); *Pennington's Adm'r* v. *Pure Milk Co.,* 130 S.W.2d 24 (1939); Prosser, Torts 137 (2d ed.); 2 Harper & James, The Law of Torts 938, § 16.11 (1956). This does not mean that any conduct shall be excused in any emergency. The conduct must be reasonable under the circumstances. The test for evaluating it is not the mere irreflexive impulse of the actor. Though there may exist an emergency,

out and that immediately you protected yourself.
—It came out towards my face.
—My question is clear, witness, you applied the brakes immediately after you saw the wasp flying from 2 or 2½ feet from you?
—Mr. Toledo: He has testified that he saw it flying from 2 to 2½ feet.
—Mr. Colón: He said that he saw it there.
—Where was the wasp flying when you saw it for the first time?
—On the windshield.
—Then you say that it was in a crack of the windshield?
—Yes, sir.
—How far was the wasp from you?
—Judge: Proceed, it is already answered.
—Mr. Colón: *When you applied the brakes,* was the wasp at the same distance, on the windshield?
—*I saw it in a crack of the windshield.*
—*And at what distance was it?*
—*At about two feet.*
—*When the wasp was two feet away when it came out of the windshield, was it then that you applied the brakes?*
—*Um-hum.*
—Judge: Colleague, I am going to ask you to step out of that place and stand here so that he can talk louder and everybody may hear him.
—Mr. Colón: *What do you mean to say, witness, by um-hum?*
—*That it occurred like that.*
—*So you applied the brakes suddenly when you saw the wasp for the first time coming out of the windshield?*
—*Yes, sir.*" Tr. Ev. 18–22.

the actor shall be responsible if his conduct was unreasonable or negligent, that is, if his conduct was not the conduct which a prudent and reasonable man would have exercised under the circumstances. *Lachman* v. *Pennsylvania Greyhound Lines*, 160 F.2d 496 (1947); *Triestam* v. *Way*, 281 N.W. 420 (1938); *Dahlstrum* v. *Hurtig*, 295 N.W. 508 (1940); *Alabama Great Southern R. Co.* v. *Hunt*, 86 So. 100 (1920); *Barkshadt* v. *Gresham*, 112 S.E. 923 (1922); *Jones* v. *Boston & Me. R. Co.*, 139 Atl. 214 (1927); *Luper Transp. Co.* v. *Barnes*, 170 F.2d 880 (1948); *Lederer* v. *Connecticut Co.*, 111 Atl. 785 (1920); *Gravel* v. *Roberge*, 134 Atl. 375 (1926); *Lemay* v. *Springfield St. R. Co.*, 96 N.E. 79 (1911); *Raolaslovic* v. *New York Cent. R. Co.*, 156 N.E. 625 (1927). See, also, 80 A.L.R.2d 24 *ab initio*, and abundant decisions to the effect cited in footnote 6 which starts on the same page. Also Prosser, *op. cit.* at 138, *ab initio*.

Restatement, *op. cit. supra*, in its comment "c" on § 296, which is the section which defines the sudden emergency rule, says:

"In determining whether the actor is to be excused for an error of judgment in a sudden emergency, importance is to be attached to the fact that many activities require that those engaged in them shall have such natural aptitude or special training as to give them the ability to cope with those dangerous situations which are likely to arise in the course of such activities. Thus, a driver of a high speed interurban omnibus would not be reasonably competent to drive unless by constant training and practice he had become capable of almost automatic reaction to the numerous situations which are likely to arise and which, when they arise, require prompt and proper action."

In *Lachman* v. *Pennsylvania Greyhound Lines, supra*, citing this comment "c" of the Restatement which we have just copied, the court said that the driver of the bus was engaged in an occupation requiring training and skill. The courts have also held that under present day traffic conditions drivers of motor vehicles must be prepared to meet

emergencies which are likely to arise. *Bybee Bros.* v. *Imes*, 155 S.W.2d 492 (1941); *Massie* v. *Barker*, 113 N.E. 199 (1916); *Ritter* v. *Johnson*, 300 Pac. 518 (1931); *Jones* v. *Boston & Me. R. Co.*, 139 Atl. 214 (1927); *cf. Ratcliffe* v. *Speith*, 149 Pac. 740 (1915). Harper & James, *op. cit. supra* at 939–40, and Prosser, *op. cit. supra* at 138, also hold the same view.

■ For the proper application of the sudden emergency doctrine, which implies damages without compensation to the injured person, it is necessary that an actual emergency has arisen, and the fear which is not proportioned to the nature of the risk or hazard alleged as a defense is not sufficient. Thus, in *De Jesús* v. *Ayende*, 32 P.R.R. 407 (1923), in which we applied it, a truck skidded on a wet highway and left the road endangering the life of the driver and of a pedestrian. In *Matos* v. *Pabón*, 63 P.R.R. 855 (1944), the situation is actually one of an unavoidable accident. Two automobiles were travelling in opposite direction from each other, and when Antongiorgi's car struck the pedestrian he knocked him down in the path of Pabón's car. Pabón was relieved, since there was no negligence on his part, and we said that a motorist is not bound to anticipate the unexpected acts of persons who are not on the path of his route and who place themselves suddenly on the spot. In *Trinity Universal Ins. Co.* v. *Farmers Coop. Exchange, supra*, a truck loaded with motor fuel caught fire and the driver had to abandon it. In *Ellmore* v. *Des Moines City Co., supra*, a bus struck a woman. In evaluating the acts of the latter, the court stated at p. 31, in applying the sudden emergency doctrine, that the law does not expect thoughtful care from the persons *whose lives are thus endangered.* In *Pennington's Adm'r* v. *Pure Milk Co., supra*, the alternative was also life or death. The driver of a truck, who was operating it at nighttime, suddenly discovered that in his path, on the road and in the opposite direction, a group of boys on sleds were

going down the hill toward the truck. The driver could prevent hitting some of the sleds, but finally he ran over one of them.

In cases of accidents caused by wasps or bees flying into moving vehicles, the majority of cases is adverse to the application of the sudden emergency rule although in some it has been applied. Of course, we are not bound by those cases, but we do recognize and shall recognize the intrinsic value of their reasoning. We are at liberty to adopt the rules which would meet the situation and needs of our medium. *People* v. *Matos*, 83 P.R.R. 323 (1961); *Belaval* v. *Sec. of Treasury*, 83 P.R.R. 244 (1961); *Cía. Azucarera* v. *Tax Court*, 72 P.R.R. 850, 861 (1951); *Corretjer* v. *District Court*, 72 P.R.R. 704, 710 (1951); *Castro* v. *González, Warden*, 70 P.R.R. 846, 854 (1950). Defendant cites the cases of *Sharp* v. *Kahn, infra; Vassia* v. *Highland Dairy Farm Co., infra; De Mott* v. *Knowlton, infra; Heerman* v. *Burke, infra*; and *Lussan* v. *Grain Dealers Mutual Ins. Co., infra*. Of these five cases the first three are adverse to it; that of *Heerman*, as we shall see, is distinguishable, and that of *Lussan* is favorable to it. We will examine briefly the cases cited and also a few others in order to determine whether they are applicable to the case at bar.

In *Sharp* v. *Kahn*, 143 So. 514 (1932), the driver of the vehicle was a young girl 16 years of age. A bee stung her on a thigh and as a result she injured the plaintiff who was horseback riding on the highway. After considering the defense of emergency set up by defendant, the court entered judgment against her on the ground that, this notwithstanding, if she had exercised the care expected of a motor vehicle driver, the accident could have been prevented. In *Vassia* v. *Highland Dairy Farm Co.*, 104 S.W.2d 686 (1937), a vehicle collided with another and the driver of the first alleged that in that moment he was trying to fan a bug out of the car with his hat. Having found that his conduct

was negligent, the court rendered judgment against defendant. In *De Mott* v. *Knowlton*, 126 Atl. 327 (1924), the vehicle was operated by a woman accompanied by some children. A bee flew into the car so that her attention was distracted, and one of the children three or four years of age put her hand on the wheel and jerked it quickly. The car veered off and injured plaintiffs. The court affirmed the judgment against defendant. The court was of the opinion that if she had exercised due care under the circumstances the accident would not have occurred.

In *Heerman* v. *Burke*, 266 F.2d 935 (1959), a new trial was ordered because the court refused to instruct the jury on the sudden emergency doctrine. As may be seen, the facts of this case are different from our case. While defendant was driving a vehicle a wasp flew into his left shirt sleeve. He testified that he tried to imprison the insect with his right hand, removed his foot from the accelerator and started to bring the car to a stop in order to remove the insect. But while trying to do that (slowing down) the wasp stung him in the armpit and he involuntarily applied the brakes fairly hard more quickly than he intended. As a result of the sudden braking the car went into a ditch and a passenger was injured. In this case the driver exercised the conduct of a prudent man, since he tried to control the situation and to stop the vehicle securely. The sting of the insect was what caused the accident. In *Lussan* v. *Grain Dealers Mutual Ins. Co.*, 280 F.2d 491 (1960), the court applied the sudden emergency doctrine when a car struck a parked vehicle when the driver attempted to hit a wasp that was discovered in his automobile. In *Rindge* v. *Holbrook*, 149 Atl. 231 (1930), judgment was rendered for defendant. In this case, while defendant was driving a car, a wasp flew into the vehicle and alighted upon her hand and she made a movement with her hand, causing the accident. In addition to the circumstance that the wasp actually alighted upon the hand of the

defendant driver of the vehicle, the court also points out in this case at p. 232 that judgment must be rendered for defendant in view of the state statutes restricting the right to recover damages by a guest in an automobile. In *Grandhagen* v. *Grandhagen*, 225 N.W. 935 (1929), the accident occurred when a wasp alighted upon the arm of the driver. The court of appeals rejected the sudden emergency defense set up by defendant and ordered a new trial because of errors committed by the trial judge in instructing the jury.

■ It is not sufficient to invoke a rule or doctrine of law and prove that it exists in order that the courts may apply it to the case under consideration. It is therefore necessary that the facts of the case, taking also into consideration the social medium in which it occurs, place the same within the ambit of the doctrine or rule invoked. We believe that the application of the sudden emergency doctrine to the case at bar was erroneous. In the first place, the situation confronting the driver of the truck was not an emergency of such a degree as to justify his applying the brakes suddenly, the actor thus forsaking his duty as a driver to be prudent and careful toward the other persons and vehicles which could be travelling at that moment along the highway. At no time did the wasp alight upon his body, as was the case in *Rindge* and *Grandhagen, supra,* nor did it sting him as in *Sharp* and *Heerman, supra.* Everything indicates that the situation was such that the proper thing would have been to stop the car slowly and then get rid of the insect. It may be argued that to apply the brakes suddenly was the driver's first impulse. Apparently it was so, but, as stated above, on the basis of the case law and the doctrine that is not sufficient to relieve him from civil liability.

In the second place, the operation of a truck-trailer, owing to its great size and weight and the hazard which that kind of vehicle represents on the highways, requires

skill which will enable the driver to meet competently and judiciously minor emergencies such as that in this case. After all, vehicle drivers in Puerto Rico who travel frequently in the rural zone know that the circumstance of a wasp flying into the vehicle is not an unexpected occurrence, not even uncommon. It is an occurrence which vehicle drivers in Puerto Rico may reasonably expect, and we do not believe that if it arises it justifies the panic nor the catastrophic conduct on the part of the operator. This brings us to the third argument: In Puerto Rico, owing to its great population density, 684 persons per square mile,[2] to its heavy traffic of motor vehicles, to its very high and increasing incidence of automobile accidents, and to its reprehensible record of producing more deaths on the roads than any of the 50 states of the United States, motor vehicle operators should drive with at least reasonable prudence.[3]

The question raised herein is not a mere conflict between the litigants; it is that, but it is also something more. We cannot establish a case law to mean that every time a wasp flies into a moving vehicle it will give rise, owing to the heavy traffic of our highways, to the probability or almost

---

[2] Planning Board of Puerto Rico, Statistical Year Book of Puerto Rico, p. 5 (1960).

[3] *Traffic Accidents in Puerto Rico*

| Years | Accidents | Deaths | Injured |
|-------|-----------|--------|---------|
| 1960–61 | 28,382 | 300 | 13,000 |
| 1959–60 | 27,244 | 341 | 12,798 |
| 1958–59 | 22,062 | 274 | 11,125 |
| 1957–58 | 19,393 | 265 | 9,662 |
| 1956–57 | 18,377 | 245 | 9,129 |

*Annual Report of the Puerto Rico Police,* 1960–61, p. 77.

According to the latest available information of the National Safety Council, in 1961 more persons were killed in Puerto Rico in automobile accidents than in any of the states of the Union and in Canada. In that year our death incidence on the highway was 13.1 (persons killed for every million miles travelled), and the highest incidence in the United States was 9.4 in the State of Nevada.

certainty that as a result the death or mutilation of one or several human beings will be produced. It is common knowledge that the sudden stop by the driver in a front car represents a hazard to the vehicles travelling behind, especially if the drivers of the latter are unable to discover any obstacle which will enable them to anticipate the sudden braking of the front vehicle.

Pound has written:

". . . The ground of liability is failure to come up to the legal standard of due care under the circumstances while carrying on some course of conduct, and so subjecting another to an unreasonable risk, whereby injury is caused to his person or substance . . . . The social interest in the general security is the interest to be promoted and maintained. The measure of application of the standard must be: Under the social and economic conditions of the crowded, mechanized society of today, what degree of diligence and care may reasonably be expected of those who are engaged in a course of conduct involving potential threat to the general security? . . . Liability for negligence is not necessarily a matter of a special duty toward the injured person. It is rather a matter of the threat to the general security . . . . The real point is the gravity of the threat to the general security in what one is engaged in doing, whether acting or failing to act, under the circumstances." V Jurisprudence 317 and 319 (1959).

Another noted scholar of the law, this time of the civil law, has stated it as follows:

"The actor of the illicit act is always liable for the damage, whether he has caused it deceitfully or by mere negligence and regardless of its degree, since the slightest fault is taken into account *because this class of fault affects the relations of social interest rather than the individual interest.*" II-I Castán, *Derecho Civil Español, Común y Foral* 490 (9th ed. 1955). (Italics ours.)

For more audacious expressions, see II-II Puig Brutau, *Fundamentos de Derecho Civil* 679 (1956), and Friedmann, Law in a Changing Society, ch. 5, p. 126 *et seq.* (1959).

■ What is reasonable or prudent conduct varies according to the circumstances in which the actor finds himself at the time of acting. The case of *Heerman* v. *Burke, supra,* contains two diametrically opposed situations (the first impulse of the driver to imprison the insect and to apply the brakes slowly, and the subsequent and involuntary action of applying the brakes suddenly when he was stung), which probably come within the test of reasonability since each act occurred under different circumstances (before and after the sting). The reason must be fitted and proportioned to the time and the event, said Cardozo, *Wagoner* v. *International R.R. Co.,* 133 N.E. 437, 438 (1921). As pointed out by Paton in his Jurisprudence, p. 176 (2d ed. 1951), the rule that a driver on the highway must exercise reasonable care to prevent injury to others is not rigid but rather elastic, because it contains the standard or rule of "reasonable care," which standard may be rationally applied to the ancient chariot or a modern car. It is these standards of conduct that make it possible for the general rules of the codes and of the common law to preserve their usefulness despite the continuous change of the medium in which they operate. For example, many legal rules formulated prior to the industrial revolution preserve their usefulness at present. The reality is that other contents have necessarily been incorporated into the same words. Looking to the future, could it perhaps be doubted that when machines travel to other celestial bodies there will also be "prudent" and "imprudent" ways of doing it? As to the eternal problem of the application of the legal rule to a particular case, tempered by equity and by the use of standards of conduct, the similarity of thought of jurists of different nationalities and of different legal systems is interesting, although actually it should not surprise us. Castán comments:

"Among the facts properly speaking and the law applicable to those facts there may be a very interesting intermediate

element to be determined by the judge or, in general, the jurist: one constituted by those indeterminate and elastic rules—called 'maxims of experience' by the Germans, 'valve concepts' by some Italian textwriters, legal 'standards' by the English doctrine, and 'directives' by modern French jurists—which the lawmaker or the case law, whichever it may be, leave to the concretion of the interpreter and which the latter must fix by extracting its contents from the practical realities of the social life.

"It is therefore an instrument of the juridical technique which, unlike the logical procedures (rules properly speaking, principles, concepts, constructions, etc.) called upon to meet the needs of the stability of the law, carries the function to perform its adaptability to life and the consequent individualization of its solutions."[4]

According to Pound, such standards are the points of contact between law and morals.[5] It may also be said that they are points of contact between law and reason, or the natural law, or equity, which is as if saying the same thing, for they are different ways of invoking an indefinite body, but present in the human mind, of ideal justice, although with a "changing content," according to the epoch, as Stammler puts it, against which to measure the positive written law or common law.[6] In applying the standards (or norms of conduct), it is necessary to individualize them in order to do justice in each case; they cannot, or should not, be applied mechanically to particular cases considered abstractedly. The contrary would convert them into mere strict rules which could operate well in some cases and wrongfully in others, but they would lose their usefulness in order to give life to the law and to do justice. Thus, for example, Julius Stone, The Province and Function of Law 185 (1961 ed.), says that in applying the standards the courts shall evalu-

---

[4] *Teoría de la Aplicación e Investigación del Derecho* 171–72 (1947).

[5] II Jurisprudence 242–43 (1959).

[6] *Wirtshaft and Recht*, cited in Pound, Jurisprudence, I, 148, and II, 232. See, also, Cardozo, The Nature of the Judicial Process 132 (1921), and in Hall, Selected Writings 161 (1947 ed.).

ate the concrete situation of the case rather than apply a formula mechanically.[7] See, also, the same work at p. 411, and the same author in Interpretations of Modern Legal Philosophies, p. 708. Pound, IV *op. cit. supra* at 28, holds the same view.

Puig Brutau, in his *La Jurisprudencia Como Fuente del Derecho*, says at p. 205:

"In reality, the lawmaker places his rule-making power in the hands of the interpreter when the latter has to apply to particular situations certain standards such as good faith, reasonable conduct, just cause, due care, etc. In such cases, Julius Stone also says, the judgment may not consist in the logical formulation of an inference, but requires the trier to make a personal decision on what justice requires in view of the particular circumstances surrounding the case.

"Our Civil Code gives us several examples of this class of rules; thus, where it says that 'should the obligation not determine the degree of diligence to be observed in its fulfillment, that which would be proper on the part of a good father of a family' shall be required or that the 'diligent manager must carry out his undertaking with all the diligence of a good father of a family.'

"Also, because of this gap in the walled enclosure of the codes the existing law has an opportunity to grow and develop, under the impulse of the decisions of concrete cases, without the need of changing the rule or standard."

■ We conclude that the conduct of defendant, that is, of an adult male who, while operating a vehicle the size of a truck-trailer with air brakes, is frightened on seeing a wasp fly into the cab which did not rest on any part of his body nor sting him, as a result of which he applied the brakes suddenly, endangering human lives, was not a prudent conduct.

As to what is reasonable and prudent, reasonable and prudent persons may differ. Probably it shall always be like

---

[7] The 1961 ed. of this important work corresponds page by page with the 1950 ed. Both are published by the Harvard University Press.

that, but we cannot refuse to render a decision, § 7 of the Civil Code, 31 L.P.R.A. § 7, and in applying the ancient standard of reasonability, a concept which flows throughout practically the entire civil and common law, we shall do so bearing in mind the circumstances of the case and without forgetting either the social consequences of the rule which we lay down.[s]

For the reasons stated, the judgment of the Superior Court, Ponce Part, rendered in this case on November 29, 1962, will be reversed. Defendants are ordered to pay solidarily to plaintiff Roberto Banchs the sum of $5,000; to plaintiff parents of the minor, Máximo Banchs and Natividad Rodríguez, the sum of $2,000, plus $160 for medical and hospital expenses, and $1,000 for attorney's fees.[*]

---

[s] See, in this connection, ch. 2, "The Courts and the Evolution of Law" in Friedmann, Law in a Changing Society 24 et seq. (1959), and ch. 3, "Legal Theory and Social Evolution," by the same author, in his Legal Theory (4th ed. 1960).

[*] Compiler's Note: By order of the Court rendered December 26, 1963, the following was added to the last paragraph of the opinion: ", the liability of the insurance company, Maryland Casualty Company, being limited to the coverage of the policy ($5,000) plus attorney's fees."