ROBERTO BANCHS, menor de edad representado por su padre con patria potestad MÁXIMO BANCHS, ETC., demandantes y recurrentes, *v.* JOSÉ HUMBERTO COLÓN y/o JUAN DE DIOS COLÓN y/o JUAN HERMAN COLÓN, SEALAND SERVICE OF P.R., INC. y MARYLAND CASUALTY COMPANY, demandados y recurridos.

*Número:* R-62-306      *Resuelto:* 29 de noviembre de 1963

*Carlos E. Colón,* abogado de los recurrentes; *Rivera Zayas, Rivera Cestero & Rúa,* y *Jorge V. Toledo,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Expedimos el auto de revisión para examinar la aplicación que hizo el tribunal de instancia a los hechos particulares de este caso de la doctrina de emergencia súbita (*sudden emergency*) también conocida como la de peligro inminente (*imminent peril*).

Los hechos son los siguientes: Un varón adulto, de 54 años de edad, de ocupación conductor de camiones, mientras conducía un camión de gran tamaño por una carretera pública de Puerto Rico, se asustó al ver entrar una avispa a la cabina del camión por lo cual frenó súbitamente y como consecuencia de esa frenada un joven que iba en bicicleta detrás del camión, a quien el camión le había pasado hacía unos 10 segundos, se estrelló contra dicho vehículo sufriendo heridas considerables en la cara, cayendo inconsciente al pavimento. El camión de que se trata es uno de los de tipo compuesto por un vehículo de motor con cabina que hace las veces de remolcador (*hauler*) y por un vagón o arrastre (*trailer*) que lleva la carga. Dicho camión tenía frenos de aire.

Como resultado del accidente el menor demandante estuvo inconsciente cerca de seis horas. Estuvo recluido en el hospital 8 días y en su casa guardó cama durante dos semanas adicionales. El juez sentenciador describe los golpes, según él

los vio, ya después de curados, en la siguiente forma: "Recibió una herida como de 1 1/2 pulgadas en la ceja del ojo derecho que es casi imperceptible; una cicatriz en forma de V en la mejilla derecha visible de cerca pero no a distancia y una herida de una pulgada que ha dejado una cicatriz en el mentón derecho y cicatriz dentro de la boca de igual tamaño."

Debemos dirigirnos ahora a una parte de los hechos que resulta crítica pues es la que va a determinar si el demandado no tiene responsabilidad civil a base de la doctrina de emergencia súbita (a la cual haremos referencia más adelante) o si por el contrario dicha doctrina no es de aplicación al caso y el demandado es responsable. En otras palabras, debemos determinar si esta parte de los hechos presenta una emergencia de tal grado—tomando en consideración todas las circunstancias del caso antes mencionadas—que justifique y dé carta de impunidad al frenazo súbito y peligroso. Como esta parte de la prueba es crucial, así lo comprendieron los abogados de los litigantes y el diálogo es movido. Debido a eso hay algún elemento de contradicción en la declaración del conductor del camión pero ésta no es lo suficientemente importante para impedirnos comprender lo que ocurrió. Como suele acontecer, también en este caso una pulcra sumisión a los hechos nos da la clave.

Después de examinar la transcripción de evidencia llegamos a la conclusión que el conductor frenó súbitamente cuando vio la avispa por primera vez, dentro de la cabina, estando ésta muy cerca o pegada del parabrisas y estando como a dos o dos pies y medio de distancia de su cara, (T.E. pág. 20). Véase sobre el particular las páginas 18 a la 22 inclusives del récord que insertamos en el margen, escolio número 1. En el escolio y en el texto de la opinión hemos subrayado las partes que creemos significativas, las cuales nos hacen concluir como lo hemos hecho.

La contradicción que anteriormente mencionamos ocurre

cuando el conductor contesta, llevado de la mano de su abogado, en la siguiente forma:

—"¿Tan pronto esa avispa se metió en la cabina qué hizo esa avispa?

—Se metió por el roto del windshield.

—¿Y qué empezó a hacer?

—Empezó a correrme por la cara como pegándoseme.

—*¿Empezó a voltearle frente a la cara?*

—Sí.

—*¿Y usted empezó a moverse tratando de evitar que lo picara?*

—Sí, señor." (T.E. págs. 29-30.)

Esa declaración se desvanece ante las contestaciones del conductor en el contrainterrogatorio que transcribimos en el margen. (1)

----

(1)—"¿Testigo, podría usted explicar al Tribunal qué motivó el que usted parara en esa forma?

—Como le iba diciendo antes allí había unos árboles y habían avispas y yo estoy pendiente a alante y de momento salió una avispa de dentro del windshield . . .

—¿Del windshield?

—Del gabinete.

—*¿En qué parte del gabinete la vió?*

—*Frente del windshield.*

—¿Qué usted llama el windshield?

—El vidrio.

—¿Frente a usted o al lado?

—*Frente volando en el vidrio del windshield, salió de una rendija que había allí.*

—Lcdo. Colón: Esa avispa salió de esa rendija volando allí. Le pregunto yo ahora. La aplicación de los frenos que se hizo fuerte fue inmediatamente que vió la avispa volando en el windshield o después?

—*Cuando salió la avispa enfrené tratando de defenderme.*

—*¿Inmediatamente que vió la avispa enfrenó, inmediatamente* y después se defendió de ella?

—*Sí, señor*, me defendí y la avispa se desapareció.

—¿Pero ya usted había frenado cuando desapareció la avispa?

—Sí, señor.

—¿En algún momento esa avispa le picó a usted?

—No, señor.

—*Si le picó, o se le paró en la cara o en la mano?*

—*No, señor.*

—Lcdo. Colón: ¿Por qué?

—Porque estaba frente de mí.

—¿Por el mero hecho que la avispa estaba volando frente de usted,

Más adelante el abogado del demandante insistió en volver a precisar el momento en que el conductor frenó y dicho

trató de pararsele? ¿Yo le pregunto por qué usted concluye, díganos algún hecho para usted concluir que la avispa trató de parársele en su cuerpo.

—Porque me seguía molestando.

—Usted acaba de decir que inmediatamente que la vió enfrenó?

—Pero . . . .

—¿La avispa estaba frente a su cara o pegada del windshield?

—*Pegada del windshield.*

—¿La distancia de su cara al windshield, cuánto era?

—Así.

—Para los efectos de récord, cuánto dice?

—Como dos o dos pies y medio.

—Lcdo. Colón: ¿*De dos a dos pies y medio?*

—*Sí, señor.*

—¿*Y ahí era que volaba la avispa?*

—*Frente al windshield.*

—¿Testigo yo quiero aclarar usted ha declarado que salió la avispa y que inmediatamente usted se defendió . . . .

—Salió en dirección a la cara mía.

—La pregunta mía es clara testigo, usted enfrenó inmediatamente que vió la avispa volando de dos a dos pies y medio de usted?

—Lcdo. Toledo: El ha declarado que la vió volando de dos a dos pies y medio.

—Lcdo. Colón: Declaró que la vió allí.

—¿Por dónde volaba la avispa cuando usted la vió por primera vez?

—En el windshield.

—¿Entonces usted dice que estaba en la rendija del windshield?

—Sí, señor.

—¿A qué distancia estaba la avispa de usted?

—Juez: Adelante. Ya está contestada.

—Lcdo. Colón: *En el momento que aplicó los frenos*, la avispa estaba a la misma distancia, en el windshield?

—*Yo la vi en la rendija del windshield.*

—¿*Y a qué distancia estaba?*

—*Como a dos pies.*

—¿*Cuando la avispa estaba a esos dos pies que salió del windshield fue cuando usted frenó?*

—*Ujú.*

—Juez: Compañero voy a pedir que se salga de ese sitio y se pare acá para que él hable más duro y lo oiga todo el mundo.

—Lcdo. Colón: ¿*Qué usted quiere decir testigo con ujú?*

—*Que asimismo fue.*

—¿*Es decir que la enfrenada fue en el momento en que por primera vez vió la avispa cuando salió del windshield?*

—*Sí, señor."* (T.E. págs. 18–22.)

abogado explicó que insistía en ello porque era esencial. A eso el juez que presidía el juicio contestó: "Eso está en record. Cuando vió la avispa primero que salió del windshield enfrenó. Está en el record." (T.E. pág. 36.)

La doctrina de la emergencia súbita enuncia que el hecho de que una persona se haya confrontado con una emergencia súbita, la cual no fue ocasionada por su culpa, y la cual requirió acción rápida, es un factor a considerarse al determinar si el curso de acción tomado por esa persona fue razonable. *Restatement, Torts*, Vol. II, sec. 296; *Trinity Universal Ins. Co.* v. *Farmers Coop. Exchange*, 233 P.2d 468 (1951); *Ellmore* v. *Des Moines City R. Co.*, 224 N.W. 28 (1929); *Pennington's Adm'r.* v. *Pure Milk Co.*, 130 S.W.2d 24 (1939); Prosser, *On Torts*, 2da. ed., pág. 137; Harper & James, *The Law of Torts*, 1956, Vol. 2, pág. 938, sec. 16.11. Esto no quiere decir que ante cualquier emergencia cualquier conducta será condonada. La conducta debe ser razonable dentro de las circunstancias. El criterio para evaluarla no es el mero impulso irreflexivo del actor. A pesar de existir una emergencia el actor será responsable si su conducta fue irrazonable o imprudente; esto es, si su conducta no fue la que un hombre prudente y razonable hubiese realizado dentro de las circunstancias. *Lachman* v. *Pennsylvania Greyhound Lines*, 160 F.2d 496 (1947); *Triestam* v. *Way*, 281 N.W. 420 (1938); *Dahlstrum* v. *Hurtig*, 295 N.W. 508 (1940); *Alabama Great Southern R. Co* v. *Hunt*, 86 So. 100 (1920); *Barkshadt* v. *Gresham*, 112 S.E. 923 (1922); *Jones* v. *Boston & Me. R. Co.*, 139 Atl. 214 (1927); *Luper Transp. Co.* v. *Barnes*, 170 F.2d 880 (1948); *Lederer* v. *Connecticut Co.*, 111 Atl. 785 (1920); *Gravel* v. *Roberge*, 134 Atl. 375 (1926); *Lemay* v. *Springfield St. R. Co.*, 96 N.E. 79 (1911); *Raolaslovic* v. *New York Cent. R. Co.*, 156 N.E. 625 (1927). Véase además 80 A.L.R.2d 24, *ab initio*, y abundante jurisprudencia al efecto citada en el escolio 6 que comienza en esa misma página. También Prosser, obra citada, pág. 138, *ab initio*.

El propio *Restatement, op. cit.* supra, en su comentario "c" a la Sec. 296, que es la sección que define la regla de emergencia súbita, expresa:

"Al determinarse si el actor ha de ser exonerado por un error de juicio cometido con ocasión de una emergencia súbita, se le dará importancia al hecho de que muchas actividades requieren que aquellos que se dediquen a ellas tengan tal habilidad natural o entrenamiento especial que les permitan bregar con aquellas situaciones peligrosas que es de esperarse surjan en el curso de esas actividades. Por ejemplo, el conductor de un veloz ómnibus interurbano no estaría preparado para conducir dicho vehículo a menos que debido a su entrenamiento y experiencia sea capaz de reaccionar casi automáticamente a las numerosas situaciones que se le pueden presentar y que, de presentarse, requieren acción rápida y competente."

En *Lachman* v. *Pennsylvania Greyhound Lines,* supra, citando este comentario "c" del *Restatement* que acabamos de transcribir, el tribunal expresó que el conductor del ómnibus se dedicaba a una ocupación que requería entrenamiento especial. Así también, los tribunales han resuelto que bajo las condiciones del tránsito moderno los conductores de vehículos de motor deben estar preparados para bregar con diversas situaciones que suelen presentarse. *Bybee Bros.* v. *Imes,* 155 S.W.2d 492 (1941) ; *Massie* v. *Barker,* 113 N.E. 199 (1916) ; *Ritter* v. *Johnson,* 300 Pac. 518 (1931) ; *Jones* v. *Boston & Me. R. Co.,* 139 Atl. 214 (1927) ; cf. *Ratcliffe* v. *Speith,* 149 Pac. 740 (1915). También en ese sentido se expresan Harper & James, obra citada, págs. 939–940 y Prosser, obra citada, pág. 138.

Para la debida aplicación de la doctrina de emergencia súbita, lo cual implica daños sin compensación para el perjudicado, es necesario que haya habido una verdadera emergencia y no es suficiente un temor que no guarde proporción con la naturaleza del riesgo o peligro que se presenta como defensa. Así en *De Jesús* v. *Ayende,* 32 D.P.R. 439 (1923), en donde la aplicamos, se trataba de un camión que patinó en una

carretera mojada, saliéndose de la carretera, poniendo en peligro la vida del conductor y la de un peatón. En *Matos* v. *Pabón*, 63 D.P.R. 890 (1944), la situación es realmente la de un accidente inevitable. Se trataba de dos automóviles que corrían en dirección opuesta uno del otro y cuando el carro de Antongiorgi le dio al peatón lo lanzó inmediatamente frente al paso del automóvil de Pabón. Pabón fue exonerado ya que no hubo negligencia alguna de su parte y dijimos que un motorista no está obligado a anticipar los actos inesperados de personas que no están en el curso de su ruta y que de súbito se colocan en el mismo. En *Trinity Universal Insurance Co.* v. *Farmers Coop. Exchange*, supra, se trató de un camión cargado de combustible de motor que cogió fuego y que el conductor tuvo que abandonar. En *Ellmore* v. *Des Moines City Co.*, supra, se trató de un ómnibus que atropelló a una señora. Al evaluar los actos de ésta el tribunal expresó, a la pág. 31, al aplicar la doctrina de emergencia súbita, que el derecho no espera un cuidado esmerado de aquellas personas *cuyas vidas están en peligro*. En *Pennington's Adm'r.* v. *Pure Milk Co.*, supra, también la alternativa era de vida o muerte. El conductor de un camión, que conducía el mismo durante horas de la noche, de momento se encontró con que en su paso, en la carretera y en dirección opuesta a la que él llevaba, venía un grupo de niños montados en un número de trineos deslizándose cuesta abajo y hacia el camión. El conductor pudo evitar darle a algunos trineos pero finalmente arrolló a uno.

En los casos de accidentes ocasionados por motivo de avispas o abejas haberse introducido dentro de vehículos en marcha, la mayoría de los casos es adversa a la aplicación de la regla de la emergencia súbita aunque en algunos se ha aplicado. Desde luego, dichos casos no nos obligan pero sí reconocemos y reconoceremos el valor intrínseco que sus razonamientos tengan. Estamos en libertad de adoptar la regla que corresponda a la situación y a las necesidades de nuestro medio. *Pueblo* v. *Matos*, 83 D.P.R. 335 (1961);

*Belaval* v. *Srio. de Hacienda,* 83 D.P.R. 251 (1961); *Cía. Azucarera* v. *Tribl. Contribuciones,* 72 D.P.R. 909, 921 (1951); *Corretjer* v. *Tribunal,* 72 D.P.R. 754, 760 (1951); *Castro* v. *González,* 70 D.P.R. 887, 896 (1950). El demandado cita los casos de *Sharp* v. *Kahn,* infra; *Vassia* v. *Highland Dairy Farm Co.,* infra; *De Mott* v. *Knowlton,* infra; *Heerman* v. *Burke,* infra y *Lussan* v. *Grain Dealers Mutual Ins. Co.,* infra. De estos cinco casos los primeros tres le son adversos, el de *Heerman,* como veremos, es distinguible y el de *Lussan* le favorece. Examinaremos brevemente esos casos citados, y también algunos más, para ver cuán aplicables son al caso de autos.

En *Sharp* v. *Kahn,* 143 So. 514 (1932) la conductora del vehículo era una niña de 16 años. Una abeja la picó en un muslo y como consecuencia de ello arrolló al demandante quien iba por la carretera corriendo a caballo. El tribunal, luego de darle consideración a la defensa de la emergencia levantada por la demandada, le falló en contra razonando que a pesar de ello si ella hubiese ejercitado el cuidado que se espera de un conductor de un vehículo de motor, el accidente pudo haberse evitado. En *Vassia* v. *Highland Dairy Farm Co.,* 104 S.W.2d 686 (1937) un vehículo chocó con otro y el conductor del primero alegó que en ese momento él había estado tratando de sacar de su automóvil un insecto abanicándolo con el sombrero. Encontrando su conducta negligente, el tribunal falló en contra del demandado. En *De Mott* v. *Knowlton,* 126 Atl. 327 (1924) el vehículo era conducido por una señora que iba acompañada de algunos niños. Una abeja se introdujo en el automóvil lo cual distrajo la atención de la conductora y a la vez uno de sus niños, de tres o cuatro años de edad, puso su mano sobre el volante dándole un tirón al mismo. El carro se desvió y estropeó a los demandantes. El tribunal confirmó la sentencia en contra de la demandada. El tribunal opinó que si ella hubiese ejercido el debido cuidado en dichas circunstancias, el accidente no hubiera ocurrido.

En *Heerman* v. *Burke*, 266 F.2d 935 (1959) se ordenó un nuevo juicio porque el tribunal se negó a instruir al jurado sobre la doctrina de emergencia súbita. Como se verá, los hechos de este caso son distintos al nuestro. Mientras el demandado conducía el vehículo una avispa se le introdujo por dentro de la manga izquierda de la camisa. Éste declaró que con su mano derecha trató de aprisionar el insecto, quitó el pié del acelerador y comenzó a detener su automóvil para remover el insecto de donde estaba. Pero mientras eso hacía ("*slowing down*") la avispa lo picó en la axila, lo cual lo hizo frenar involuntariamente de manera más fuerte de lo que él se proponía hacerlo. Con motivo del frenazo el carro cayó en una cuneta y un pasajero resultó herido. En este caso el conductor inició el curso de conducta de un hombre prudente pues trató de controlar la situación y de detener el vehículo en forma segura. Fue la picada del insecto lo que causó el accidente. En *Lussan* v. *Grain Dealers Mutual Ins. Co.*, 280 F.2d 491 (1960), el tribunal aplicó la doctrina de emergencia súbita cuando un automóvil chocó con otro que estaba estacionado debido a que en esos momentos el conductor del primer vehículo se defendía de una avispa que estaba dentro de su automóvil. En *Rindge* v. *Holbrook*, 149 Atl. 231 (1930), se falló a favor de la demandada. En este caso mientras la demandada conducía un automóvil una avispa se introdujo en el vehículo y se le posó sobre una mano con motivo de lo cual ella hizo un movimiento brusco, lo que ocasionó el accidente. En este caso además de la circunstancia de que la avispa en efecto se le posó sobre la mano a la demandada conductora del vehículo, el tribunal también señala, a la pág. 232, que debía fallar a favor de la demandada en vista del estatuto del estado que contiene limitaciones al derecho de un pasajero-huésped de recobrar daños sufridos mientras viaja como huésped en el automóvil. En *Grandhagen* v. *Grandhagen*, 225 N.W. 935 (1929), el accidente ocurrió cuando la avispa se posó sobre un brazo del conductor. El Tribunal de Apelación

rechazó la defensa de emergencia súbita planteada por el demandado y ordenó un nuevo juicio debido a errores cometidos por el juez sentenciador al instruir al jurado.

■ No basta invocar una regla o doctrina de derecho y probar que ésta existe para que los tribunales procedan a aplicarla al caso bajo consideración. Para ello es necesario que los hechos del caso, tomando también en consideración el medio social en que éste ocurre, lo sitúen dentro del ámbito de la doctrina o regla invocada. Creemos que la aplicación de la doctrina de emergencia súbita al caso de autos fue errónea. En primer lugar, la situación con la cual se confrontó el conductor del camión no fue una emergencia de tal grado que justificase el frenar súbitamente, abandonando así el actor su deber de conductor de ser prudente y cuidadoso para con las demás personas y vehículos que pudiesen estar transitando en esos momentos por la carretera. En ningún momento la avispa se le posó encima de su cuerpo, como ocurrió en los casos de *Rindge* y de *Grandhagen*, supra, ni le picó, como en *Sharp* y en *Heerman*, supra. Todo indica que la situación fue tal que lo correcto hubiese sido detener el camión en una forma prudente y entonces disponer del insecto. Puede argumentarse que frenar súbitamente fue el primer impulso del conductor. Aparentemente así fue pero, como hemos señalado antes, apoyados por la jurisprudencia y la doctrina, eso no basta para exonerarlo de responsabilidad civil.

En segundo lugar, el conducir un camión-arrastre, debido a su gran tamaño y peso y al peligro que esa clase de vehículos representa en las carreteras, requiere una pericia que le permita al conductor enfrentarse a pequeñas emergencias como la de este caso en forma más competente y juiciosa. Después de todo, los conductores de vehículos de Puerto Rico que transitan con alguna frecuencia por la zona rural saben que la circunstancia de introducirse una avispa dentro del vehículo no es una ocurrencia inaudita, ni siquiera rara. Es una ocurrencia que los conductores de vehículos en Puerto

Rico pueden razonablemente esperar y no creemos que de ocurrir justifica el pánico ni un comportamiento catastrófico de parte del conductor. Esto nos trae al tercer argumento: En Puerto Rico, debido a su gran densidad poblacional, 684 personas por milla cuadrada, (²) a su denso tránsito de vehículos de motor, a su altísima y creciente incidencia de accidentes automovilísticos y a su incalificable récord de producir más muertes en la carretera que ninguno de los cincuenta estados de los Estados Unidos, los conductores de vehículos de motor deben conducir con por lo menos una razonable prudencia. (³)

La cuestión aquí planteada no es solamente un conflicto entre los litigantes; es eso, pero también es algo más. No podemos establecer una jurisprudencia que signifique que cada vez que una avispa se introduzca en un vehículo en marcha ocasionará, debido al abundante tránsito de nuestras carreteras, la probabilidad o la casi certeza de que como consecuencia se va a producir la muerte o la mutilación de uno o de varios seres humanos. Es de conocimiento general lo peligroso que resulta para los vehículos que lo siguen el que el conductor

---

(²) Junta de Planificación de Puerto Rico, *Anuario Estadístico de Puerto Rico*, 1960, pág. 5.

(³)

*Accidentes de Tránsito en Puerto Rico*

| Años | Accidentes | Muertos | Lesionados |
|------|-----------|---------|-----------|
| 1960–61 | 28,382 | 300 | 13,000 |
| 1959–60 | 27,244 | 341 | 12,798 |
| 1958–59 | 22,062 | 274 | 11,125 |
| 1957–58 | 19,393 | 265 | 9,662 |
| 1956–57 | 18,377 | 245 | 9,129 |

—*Informe Anual de la Policía de Puerto Rico*, 1960–61, pág. 77.

Según la última información que tenemos a la mano del Consejo Nacional de Seguridad (National Safety Council) en el año 1961 en Puerto Rico resultaron muertas más personas en accidentes automovilísticos que en ninguno de los estados de la Unión y que en Canadá. Ese año nuestra incidencia de muertes en la carretera fue de 13.1 (personas muertas por cada cien millones de millas viajadas) y la incidencia más alta en los Estados Unidos fue de 9.4, en el Estado de Nevada.

de un vehículo que va al frente detenga súbitamente el suyo, especialmente si los conductores que van detrás no pueden ver que adelante haya obstáculo alguno que les haga anticipar la frenada súbita del vehículo que va delante.

Ha escrito Pound:

"Se funda la responsabilidad civil en la conducta que no ha satisfecho el standard del debido cuidado bajo las circunstancias del caso, exponiendo así a otros a un riesgo irrazonable, causándole daños. El valor a ser protegido es el interés social en que haya seguridad para todos. La medida de la aplicación del standard debe ser la siguiente: Bajo las condiciones de la apiñada y mecanizada sociedad de hoy, ¿qué grado de diligencia y cuidado puede esperarse razonablemente de aquellas personas que llevan a cabo actividades que envuelven un peligro potencial para la seguridad general? . . . La responsabilidad debido a negligencia no es un asunto necesariamente limitado a la relación del deber especial de cuidado que tiene el actor para con la persona perjudicada. Se trata más bien del riesgo a que se somete toda la sociedad. Realmente la cuestión es el grado de riesgo que determinada conducta impone a la seguridad general, a la protección de la cual el perjudicado tiene derecho."—*Jurisprudence,* 1959, Vol. V, págs. 317 y 319.

Otro eminente estudioso (*scholar*) del Derecho, esta vez del derecho civil, lo ha expresado como sigue:

"El autor del acto ilícito responde siempre del daño, ya lo haya producido dolosamente o por simple negligencia y cualquiera que sea su grado, pues se tiene en cuenta hasta la más ligera falta, *en atención a que esta clase de culpa afecta más bien que al interés privado, a relaciones de interés social.*"—Castan, *Derecho Civil Español, Común y Foral,* 9a. ed., 1955, Tomo I, Vol. II, pág. 490 (subrayado nuestro).

Para expresiones más audaces véase Puig Brutau, *Fundamentos de Derecho Civil,* 1956, Tomo II, Vol. II, pág. 679; y Friedmann, *Law in a Changing Society,* 1959, Capítulo 5, págs. 126 y ss.

█ Lo que es conducta razonable o prudente varía según las circunstancias en que el actor se encuentre al momento de

actuar. El caso de *Heerman* v. *Burke*, supra, contiene dos situaciones diametralmente opuestas (la primera decisión del conductor de aprisionar el insecto y de frenar lentamente y la acción posterior e involuntaria de frenar bruscamente al ser picado) que probablemente caen dentro de la norma de razonabilidad, porque cada acto ocurrió dentro de distintas circunstancias (antes y después de la picada). La razonabilidad debe ser la que cuadre al tiempo y al suceso, expresó Cordozo, *Wagoner* v. *International R.R. Co.*, 133 N.E. 437, 438 (1921). Como señala Paton en su *Jurisprudence*, 2da. ed., 1951, pág. 176, la regla de que un conductor en la carretera deberá observar cuidado razonable para no causar daño a otros no es rígida sino flexible debido a que contiene el standard o norma de "cuidado razonable", cuyo standard es susceptible de aplicación racional tanto a una antigua carreta o a un moderno vehículo de motor. Son estos standards o prototipos de conducta los que hacen posible que las reglas generales de los códigos y del derecho consuetudinario conserven su utilidad a pesar del cambio incesante del medio en que operan. Por ejemplo, muchas reglas jurídicas formuladas antes de la revolución industrial mantienen su utilidad hoy. La realidad es que dentro de las mismas palabras se han vertido, por necesidad, otros contenidos. Mirando al futuro, ¿puede dudarse acaso de que cuando haya máquinas que viajen a otros cuerpos celestes, habrá también maneras "prudentes" y maneras "imprudentes" de hacerlo? Sobre el eterno problema de la aplicación de la regla jurídica al caso concreto, templada por la equidad y por el uso de los standards o prototipos de conducta, es interesante, aunque realmente no debe sorprendernos, la similitud del pensamiento de juristas de diversas nacionalidades y de diversos sistemas de Derecho. Castán comenta:

"Entre los hechos propiamente dichos y el Derecho aplicable a esos hechos, puede haber un elemento intermedio muy interesante, que habrá de fijar el Juez o, en general, el jurista: el constituído por aquellas reglas indeterminadas y flexibles—

llamadas 'máximas de experiencia' por los alemanes, 'conceptos válvulas' por algunos tratadistas italianos, 'standards' jurídicos por la doctrina inglesa y 'directivas' por modernos juristas franceses—que el legislador, o la jurisprudencia en su caso, dejan a la concreción del intérprete, y ha de fijar éste extrayendo su contenido de las realidades prácticas de la vida social.

"Se trata, pues, de un instrumento de la técnica jurídica que, a diferencia de los procedimientos lógicos (reglas propiamente dichas, principios, conceptos, construcciones, etcétera) llamados a satisfacer las necesidades de estabilidad del Derecho, tiene por función realizar la adaptabilidad del mismo a la vida y la consiguiente individualización de sus soluciones." ([4])

Son estos standards, en opinión de Pound, puntos de contacto entre la ley, y la moral. ([5]) Puede decirse también que son puntos de contacto entre la ley y la razón, o el derecho natural, o la equidad, que es como decir lo mismo, pues esas son diversas maneras de invocar un cuerpo indefinido, pero presente en la mente humana, de justicia ideal, aunque con un "contenido cambiante", según la época, como diría Stammler, contra el cual medir el derecho positivo escrito o consuetudinario. ([6]) Al aplicar los standards (o normas o prototipos de conducta) hay que individualizarlos para hacer justicia en cada caso; no se pueden, o no se deben, aplicar maquinalmente a los casos concretos considerados en abstracto. Lo contrario los convertiría en meras reglas rígidas que podrían funcionar bien en unos casos y mal en otros, pero perderían su utilidad para darle vida al derecho y para hacer justicia. Así, por ejemplo, Stone, Julius, *The Province and Function of Law*, ed. de 1961, pág. 185, expresa que al aplicar los standards los tribunales deben valorar la situación concreta del caso en vez

---

([4]) *Teoría de la Aplicación e Investigación del Derecho*, 1947, págs. 171–172.

([5]) *Jurisprudence*, 1959, Vol. II, págs. 242–243.

([6]) *Wirtschaft and Recht*, citado en Pound, *Jurisprudence*, I, 148 y II, 232. Véanse también Cardozo, *The Nature of the Judicial Process*, 1921, pág. 132, y en *Selected Writings*, Hall, ed. 1947, pág. 161.

de aplicar la fórmula verbal maquinalmente. (⁷) Véase también la misma obra, pág. 411 y el mismo autor en *Interpretations of Modern Legal Philosophies*, pág. 708. En igual sentido se expresa Pound, obra citada, IV, 28.

Puig Brutau, en su *La Jurisprudencia Como Fuente del Derecho*, pág. 205, expresa:

"El legislador, en realidad, deposita su poder normativo en las manos del intérprete cuando éste ha de aplicar a determinadas situaciones ciertos standards como buena fe, conducta razonable, justa causa, cuidado debido, etc. En semejantes casos, dice también Julius Stone, el juicio no puede consistir en la formulación lógica de una deducción, sino que requiere del juzgador una decisión personal acerca de lo que la justicia exige en vista de las circunstancias concretas que el caso ofrece. . . . . .

"Nuestro Código civil nos brinda varios ejemplos de esta clase de normas; así, al hablar de que 'cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia,' o de que el 'gestor oficioso debe desempeñar su cargo con toda la diligencia de un buen padre de familia'.

"También, pues, por esta brecha que existe en el recinto amurallado de los Códigos tiene oportunidad de crecer y desarrollarse el Derecho vigente, al impulso de las decisiones de los casos concretos, sin necesidad de cambiar la norma o standard."

■ Concluimos que la conducta del demandado, esto es, la de un varón adulto, quien mientras conduce un vehículo de las proporciones de un camión-arrastre, con frenos de aire, se asusta al ver entrar una avispa a la cabina del mismo, cuyo insecto no se le posó en parte alguna de su cuerpo, ni le picó, con motivo de lo cual frenó bruscamente, poniendo en peligro vidas humanas, no fue una conducta prudente.

Sobre lo que es razonable y prudente personas razonables y prudentes pueden discrepar. Probablemente así ocurrirá siempre, pero no podemos rehusar fallar, Art. 7, Código Civil, 31 L.P.R.A. sec. 7, y al aplicar el antiguo standard de la

---

(⁷) La edición de 1961 de esta importante obra corresponde página por página con la de 1950. Ambas son de la Harvard University Press.

razonabilidad, concepto que fluye por casi todo el Derecho civil y consuetudinario, lo haremos teniendo en cuenta las circunstancias del caso y sin olvidar tampoco las consecuencias sociales de la norma que establecemos. (8)

*Por los motivos expuestos se revocará la sentencia del Tribunal Superior, Sala de Ponce, dada en este caso en 29 de noviembre de 1962. Se condena a los demandados a pagar solidariamente al demandante Roberto Banchs la suma de $5,000.00; a los demandantes padres del menor Máximo Banchs y Natividad Rodríguez, la suma de $2,000.00, más $160.00 por gastos médicos y de hospitalización incurridos; y $1,000.00 por concepto de honorarios de abogado.(\*)*

---

(8) Sobre el particular puede verse el capítulo 2, "The Courts and the Evolution of Law" en Friedmann, *Law in a Changing Society*, 1959, págs. 24 y ss., y el capítulo 3, "Legal Theory and Social Evolution", del mismo autor, en su *Legal Theory*, 4ta. ed., 1960.

(\*) Nota del Compilador: Mediante resolución del Tribunal de fecha 26 de diciembre de 1963, se adicionó lo siguiente al último párrafo de la opinión: ", quedando limitada la responsabilidad de la compañía aseguradora, Maryland Casualty Company, hasta el límite de la póliza ($5,000.00) más los honorarios de abogado."